Good morning, Your Honor. Jim Perkins for appellant Mr. DeAtley. I apologize for my voice and getting over a cold. I'll speak up or try to speak more clearly if that's a problem. There's something fundamentally inconsistent and troubling about a law firm that charges a client approximately $380,000 to prosecute a case and then when their work is challenged, claim that from day one, the case, there was no case and it was barred as a matter of law. Those two positions are fundamentally inconsistent. Equally troubling in terms of the arguments now made on appeal is the fact that Holland & Knight, when they filed the case, now say, oh, there was an oral agreement or promissory estoppel claim that was firm, it was valid, it was property of the estate, it should have been scheduled, and yet the lawsuit they filed doesn't raise either of those claims. I see that. I mean, we've all been in situations where the client comes in to us with a story that sounds like a good story and we start pursuing it hammer and tongs and then as things develop in the case, it turns out our client led us astray and it's a bad case. It happened to us all. If those were the facts, Your Honor, we might have something different. But in this case, we have the declaration of Mr. DeAtley that says at inception before the lawsuit was filed, he explained what his discussions had been with his father, he disclosed his bankruptcy, he disclosed all of the prior facts which later came through and maybe it isn't. This is a summary judgment motion, Your Honor. Right, but that's not the disputed issue of fact. Look, I'm having trouble getting around the fact that there's all this evidence from DeAtley and his wife that for years they believe they own an interest in the business. And there's also the incontrovertible evidence that on their bankruptcy schedules they said they didn't. It looks as though either the bankruptcy schedules are true and their claims to own an interest in the business are false or what they said on the bankruptcy schedules was false, in which case they're precluded by judicial estoppel from now taking a position of the contrary, even though they've taken advantage of their declaration in the bankruptcy schedules to keep their creditors from getting their share of the business. I just don't understand how you get around that. Very simply, Your Honor, in terms of consistency, because I think their positions have been consistent. According to the record and Jennifer Belli's declarations as well, they went, they told her, the original bankruptcy lawyer, about whatever the conversations and work had historically been with Father Albert DeAtley. She advised him that there was no claim there and it need not be scheduled. I understand the arguments about, you know, you should have a claim against the lawyer. So what? Your lawyer acts on your behalf and you are estopped or not by the declarations your lawyer makes on your behalf. They got the benefit of what the lawyer did on their behalf. Actually not, Your Honor, because I want to go on the consistency. They went a second time. They went to Holland and Knight years later. They provided the same information. Holland and Knight didn't sue on an oral contract or promissory estoppel claim preceding the bankruptcy. They didn't say there was anything there. They didn't frame a complaint. They made no allegations and pressed no claims that there was anything there. We have two separate law firms equally looking at all of the same facts and saying there was nothing there and agreeing that it shouldn't be scheduled. The only change comes afterwards, after the 94 guarantee, which is completely separate, completely different on its basis and on its facts. Only after that has been prosecuted and we have this malpractice claim, suddenly people shift back and say, oh, these prior determinations of there being something there are completely wrong. That isn't how the experienced lawyers, not just the inexperienced client who isn't a lawyer, handle it. That's how the experienced lawyers handle it. The client is favored by each of those what you describe now as opinions rendered by lawyers. In fact, if I look at the big picture, the client was enormously favored. He struck a settlement for $5.6 million, none of which went to the creditors in his bankruptcy. Why shouldn't there be fair game? He got away with the $5.6 million. So how is it that lawyers giving clients advice that the clients want to hear somehow immunizes the client from the determination that, you know, that really should have been part of his bankruptcy schedule? I don't see how it couldn't have been part of his bankruptcy schedule. If, Your Honor, if the conclusion, that's another one of our arguments, is that somehow there was something that the bankruptcy creditors have some interest in or deserve to have some interest in, then you include the trustee, which the lower court didn't do. Can we do that and put the $5.6 million back into play? Actually, it would, and to some extent it would. Because what you need to do then, and judicial estoppel, when you say the creditors are hurt, judicial estoppel cuts them off. The court cuts off their right to collect anything back. And it also ignores the apportionment issue, which the lower court ignored. Frankly, I don't think there's any way the creditors can come back now, but I don't understand the point you just made. Ruling that your client is a stop doesn't at all affect the creditors who have been defrauded by his failure to list the item on the schedule. The claims are dismissed. The claims disappear. Instead of bringing in a trustee and determining on an allocation basis, which is another of the arguments that we make and is clear under bankruptcy law, part of the consideration for the $5.6 million, when you say it's in play, it wouldn't just be totally refunded. Are you saying that we should reopen the bankruptcy so that the creditors can get the $5.6 million plus whatever the ATLE gets from Holland and Knight? The opportunity for the bankruptcy trustee to look at it. Are you saying we can do that? If you bring the bankruptcy trustee in, I believe that they have an opportunity to then ask the court whether to reopen it or not. That's a decision the trustee would get to make. And you would concede that they're entitled to if they wish to? Well, yeah. If the bankruptcy trustee came in and said yes, if the bankruptcy trustee came in and thought there was a claim and thought that there was money, that there was something legitimate to prosecute. You would not oppose such a claim on behalf of the creditors? If they thought that there was a legitimate, serious claim under the promissory staff or oral contract that was supported by consideration that would have brought value to the estate, they should have that opportunity. You're declaring in court on behalf of the ATLE that he will pose no objection to recovery by the creditors if the bankruptcy trustee seeks it of the $5.6 million plus whatever he gets from hell on the night? I think the bankruptcy trustee has to have an opportunity to come in and tell the court whether under bankruptcy law they have an opportunity to reopen the claim at this point. They should legitimately have the opportunity if, in fact, there was some claim there. It's our position that there wasn't a claim there. In order for there to be a claim there, which is property of the estate, there had to be something sufficiently specific to enforce. That's the difference in part between promissory estoppel and a contract. A contract has all the essential elements, as you know, that would allow for legal enforcement, not equitable enforcement, legal enforcement. On a promissory estoppel claim, there may not have to be quite as much, but there needs to be something there. When was the promise going to be performed, which was never there in this case? What exactly was the interest to be transferred that was never there? What services needed to be performed in order to justify the transfer of the interest? All of the material elements even on promissory estoppel to enforce something weren't there and have never been shown to have been there, which is why there was no claim that was needed to be scheduled in the bankruptcy court. There's a ---- I have to say to you that my review of this led me to the conclusion, or at least the view, that the guarantee that was entered sometime after the bankruptcy doesn't make sense as a purely post-petition deal. And so I hear what you're saying. There are certainly legal arguments that would be offered up, but if you look at this whole transaction and you look at the history related by your client to support his claim, that history goes way back years before the bankruptcy and suggests that none of that matters and that the deal that was ultimately entered into with his father was generated purely from things that happened after the bankruptcy is a tough sell. I think the record here, if it discloses one thing, Your Honor, it's been that there has been frequently throughout the years an adversarial relationship between father and son. There have been times in which they've gotten along and there have been times in which they've been hammer and tong adversaries, no question. And you have to square the father telling bankruptcy counsel and taking his own position that there was nothing there, that there was no promise. That benefited everybody at the time. They didn't want something to be there because they didn't want anything of value that belonged to the family business to go over to Alan's creditors. So the notion that, hey, let's all agree that there's nothing that we have to file, the whole point of it is it's a bankruptcy court and the creditors are supposed to have an honest shot at that. And by leaving it off the schedule, that deprives them of that. They don't know anything that's out there. So the fact that these people in this circle, Alan, his father, the lawyers, all decide we don't have to file this isn't very compelling. The whole point of it is that it's not their decision. The father, when he was sued afterwards, didn't come up and say, oh, I had an agreement with my son. I had an enforceable agreement that is subject to the bankruptcy court. When they're adversaries to do so. It doesn't surprise me he says I'm not liable. It's a terrific way to avoid gift tax and estate tax. It's not a gift and it's not a bequest if you get sued for it in your cave. Your Honor, just in terms of the record of how this transpired, I can say that you can't doubt that the father and son have been active and spent thousands and hundreds of thousands of dollars in fighting each other over whether there was any money that was going to be crossed between the two of them. This suggests that they were colluding only to spend against each other hundreds of thousands of dollars and then transferring eventually some $5 million under protest after spending gazillions with lawyers. If they viewed this in your manner as a gift tax, dad could roll over. You're right. I entered this 94 guarantee. Here's all your money. Why would he spend probably more than my client in terms of his legal fees, vigorously opposing paying the son anything? He would not have done that if this had been some collusion between dad and son. It would make no sense. What the trial court ignored, and I go back to the apportionment argument, to the extent which was followed through, to the extent that the guarantee required new post-bankruptcy consideration, new work, new consulting services. That money would belong to Mr. Diadle and not to the estate. Is it true that to avoid the force of Hamilton v. State Farm, you need to establish that the cause of action against the father did not arise until after the bankruptcy? You have to establish that there are a different claim and different facts on different bases, and I think that's reflected in the record. The guarantee in writing is a contractual claim. It is not a promissory estoppel claim. The fundamental facts and legal tests of which are entirely different are similar. The guarantee had a million dollar a year if you don't pay penalty. That was never part of any oral contract or any promissory estoppel claim. It had a specific date. That was never part of any oral contract or promissory estoppel claim. The services were described. That was never described in any oral contract or promissory estoppel. The elements for which recovery was being sought never existed with regard to anything pre-bankruptcy, and so what you have is, at least at worst in part, is a complete post-bankruptcy new agreement for personal services for which there needed to be an allocation, and the court just didn't consider allocation and never got to that issue, and if at worst there needs to be an allocation, the summary judgment judicial estoppel is wrong. That also goes to the inconsistency of positions. If the contract, if the new one million penalty clause and the dates and what needs to be done, if all those terms never existed before 1994, you have a different claim, and for there to be judicial estoppel, you have to have identical claims for which there has been some inconsistency of conduct. This was a completely differently foundational claim, and that necessity of inconsistency doesn't exist, which would preclude judicial estoppel, and standing would flow in terms of the apportionment argument. If Mr. D'Ali has post-petition services that he's performing for even some of the consideration that he got, he has standing to pursue that from his father, and the 5.6 million wasn't the totality of the money that was owed under the contract. The father didn't comply in six years. He had $6 million just in penalty clauses, let alone the half value of superior, so my client didn't get full payment in any way, shape, or form by way of the settlement for the guarantee contract. If there was something under the oral contract or the promissory estoppel, if there's something there that the facts at a trial, and again, this is summary judgment, might establish that there was value somehow or other, there's an opportunity for there to be money there. It isn't just the $5.6 million that was obtained. I'd like to save the rest for rebuttal. Thank you. Thank you, counsel. Good morning, judges. My name is Pete Vial. I'm here on behalf of the appellees Holland and Knight, Chris Howard, and his wife, Jamie Howard. The district court concluded that for two reasons, Alan would have lost the lawsuit he brought against his father for a 50% interest in the superior companies. Could you point us to your best evidence for which there's no genuine issue of material fact that this was not a post-bankruptcy claim arising on a post-bankruptcy contract? Yes. In the brief that we have submitted at pages 8 to 14, is a recap of testimony from Alan D'Atley and his wife, that in the mid-70s, his father said, I want you to leave college, come work for me, and I'll give you half the company. Then in the 80s, he had lawyers of his father prepare documents to memorialize that, and both he and his wife testified that they believed they had, in Alan's words, it was not a leading question from a lawyer, a vested 50% interest. I think it is significant that while the causes of action that Alan could have asserted coercively against his father to compel disgorgement of the interest may have evolved from initially promissory estoppel to then an oral contract, then in 1990, I'm jumping back now to those pages 8 to 14, in 1990, there was a writing signed by Alan, by his wife, by his mom, that said, I get a 50% interest starting now. And the testimony at SER 253 that is uncontested is that Albert said, Yes, Alan, I'll sign it too. So the causes of action may have evolved initially from promissory estoppel, leave and come work for me, which he did for more than 15 years, to then an orally partly written, partly performed contract by 1990. And then those same pages recap that Alan's unquestioned testimony is that at least as of the beginning of 1992, he had a clear promise from Albert that if you will go to Blaze, which is where he was when the bankruptcy was going on, train somebody there for a year and come over to Superior, that then I will give you your 50% finally. I don't think you need the guarantee agreement. In fact, it's not clear it was ever written, much less ever signed by anybody. I think wholly apart from that guarantee agreement, he had interests within the meaning of the bankruptcy code. He had claims against his father if his father tried to renege. And he had an executory contract within the meaning of the bankruptcy code. And the line of cases that we have in our brief at pages 38 and 39 that derive from the United States Supreme Court decision in Siegel make it perfectly clear that after acquired property can be a part of the bankruptcy estate if it is sufficiently rooted in pre-petition conduct. And heavens above, that's what happened here. He left college in the mid-'70s. He worked nonstop through the-'80s. He had an agreement signed by everyone necessary except his father and unequivocal testimony from Allen at SCR 253 that his dad said he would sign it. What's the significance of the contentions, apparently facts, that both the bankruptcy lawyer in New Mexico and your client advised Allen that there was not a claim that needed to be scheduled at the time of the bankruptcy filing? Matt, I'd rather separate them because they're a bit different and they occurred at different times, and I'll take them in whatever order you prefer. Well, we'll do it chronological, so you can start with New Mexico. All right. Starting in New Mexico, I have a couple of answers. If what Albert told Jeanne Beals, supposedly, were determinative of whether Allen had an interest, he never had one because even 12 years later in 2004, after the supposed guarantee agreement had been written and signed, Albert denied that he signed it, denied that there was agreement, denied that Allen had any interest. So if a bankruptcy lawyer could decide whether to disclose by calling the party to be charged and saying, does my client really have an interest in half of what you own? And as many of your questions to Mr. Perkins pointed out, it certainly benefited Albert to say, hell no. If either Albert's testimony, if indeed it occurred to Ms. Bayless or her decision to then say, okay, we're determinative, we'd have all kinds of mischief. The cases also make perfectly clear, it is the cases are recapped at pages 44, 45 of our brief, that lack of standing is unaffected by inadvertence of nondisclosure or by reliance on counsel. That's what the Eastman case says. That's what the In Re Superior Crew Boats case says. Let me digress just a second. I want you to go back to the answer, but we've got both standing and judicial estoppel here, and I want to be clear I understand the legal theories. Are both necessary, or can you succeed in your position by winning, in particular, on standing by itself without needing judicial estoppel? Either work independently. They are related. And just so you understand, judicial estoppel for me is a little tougher here. The bad faith element intersects very much with the attorney advice, and Alan has a somewhat better case for saying, look, I did what the lawyer said, and so forth, and try to separate himself. I think standing, he's got more difficulty. So for my purposes, I'm more interested about standing. And to the extent that's useful to you in answering the question I posed before, I want you to have that context. Thank you. Coming back to Ms. Bayless, it would have been, there is a good logic to Eastman and NRA's superior crew boats. They say reliance on counsel doesn't work. You may have a claim against that lawyer, but you can't. Here there were the initial debts listed in the bankruptcy were 1.4. He went back in 93 and reopened it to list a new 1.8. Well over $3 million in debts were extinguished, and those people can't be out all that money. Ms. Bayless could very well, or Alan, who signed the schedules and got the discharges could very well have said, I have an interest. Since 1975, my dad has promised me 50 percent. It's never changed. It didn't go up. It didn't go down. The causes of action pertinent to it may have evolved, but it was from 1975 through to today a 50 percent interest. He could have said, I have that interest. I also have claims against my father for promissory estoppel, for oral contract, for part performance of an executory contract. I also have claims based on all that, and my dad denies it. So creditors, trustee, in determining whether you want to rely on my testimony to pursue this, take that into account. That's how this ought to have played out. That's how this ought to have played out. You asked, and I haven't gotten to and I would like to, the argument by Alan that Holland and Knight was hired to research all this and told him there was no problem. I believe it was Judge Kleinfeld's question said, that's what he says. We don't know whether that's true. And, of course, that's right. It's more significant than that. And, of course, lawyers aren't like Rumpelstiltskin. We can't spin gold out of straw. We try real hard a lot of times, though. Indeed. And so if any of us, either in good faith or out of some kind of craven venal notion of currying favor with clients, tells a client, you've got a good case and you don't, we may have to disgorge fees, but we can't give the client a cause of action he didn't have. And here, Judge Quackenbush correctly concluded that because the interest and the claims and the executory contract, because none of them had been disclosed, there was no standing and he was judicially estopped. Nothing that Holland and Knight did or didn't do affected that. Moreover, the record, the arguments that Holland and Knight was hired to do that, it's nowhere in the record. Mr. Perkins won't be able to show you a site. And, indeed, the record is to the contrary. If we go to SCR pages 44 to 46, they are excerpts from the complaint not that Holland and Knight prepared, but the complaint that Mr. Puccini out of New Mexico prepared to sue Holland and Knight. I think his argument is a little different. I think his argument is if it was plain from the get-go that I had no claim against my father because I had no standing to bring it, it having passed to the bankruptcy estate, or I was estopped to bring it because I didn't list it in the bankruptcy estate, then why do you run up $300,000 in fees on me that you sued me for, for suing my claim that was no good from the get-go? I want to be directly responsive. That's where I was going and I didn't mean to be so tedious. That's what this case grows out of. You sued him for the fees. He counterclaimed for malpractice. Right. He may get fees back from us, although he signed a consent judgment saying pay them all, and that's not on appeal. But his remedy, if we have given him bad advice, is to get the fees back. We can't, by telling him you've got a good claim when you don't, create a multimillion-dollar claim that was never his because decades before we came on the scene, he failed to disclose it and flushed over $3 million worth of creditors' claims that would, by 2004, have been worth multiples of that. But going back to SCR 44-46, Mr. D'Atley himself says, I hired, not Holland & Knight, I hired a Colorado law firm, Hale Friesen, to research this and advise me on my claims against my father. They, not I, went to Holland & Knight less than three weeks before the complaint was filed to hire them as local counsel to bring an action in Washington. There was already litigation in Colorado. And, indeed, Hale continued. It was not until months later, when they had had their fill of Mr. D'Atley and got out, that Holland & Knight was anything other than local counsel. It was six months after that that they hired Richard Price, a very good lawyer from eastern Washington, to come in and look over Holland & Knight's shoulder. They weren't hired to do these things. Holland & Knight didn't give that advice. But even if they had, they would be required to give back fees. But they can't, by saying there isn't promissory estoppel or there isn't a lack of standing, erase what Mr. D'Atley had done in 1992 on the advice of Ms. Bayless. Have I answered what you were asking about? I think so. I'm still a little troubled because, frankly, it's hard for me to imagine a firm like Holland & Knight running up $300,000 in fees on a case they knew was bummed from the get-go. They didn't know it was bummed from the get-go. I mean, they took the case from Hale Friesen because the lawyers knew the lawyers there. They worked on it hard. They'd gotten started. They were several months in. Hale Friesen pulled out, at which point there was just Armageddon and a flurry of activity. They worked as hard as they could. Judge Quackenbush is an experienced, tough trial judge. He was pushing them. They worked as hard as they could for a year and several months, at which point they withdrew, and they didn't get paid. They didn't get paid anything for all that effort, and they went after him, which probably was dumb, but they did. So it's the kind of case where it takes a fair amount of work before you figure out it was bummed from the get-go. Well, particularly where you are figuratively out on point with bullets whistling over your head the entire time. Oh, sure. We've all been there. And that's what occurred, and that's what the record shows. Holland & Knight wasn't hired to figure this all out, to file it. Holland & Knight came in and filed a complaint on behalf of a firm they liked and respected. Several months later, that firm was gone, and the war was on. So you got hired midstream? No. We were hired before the case here was filed. I think the record on this, what is really in the record, is fairly limited, but I believe that that S.E.R. 44 to 46, Mr. D'Atley says that Hale Friesen hired us on July 2. The complaint was filed July 22. So, yes, the train was already way down the track. We filed their complaint. And then, still, we're serving as local counsel. There was litigation, active litigation, in the district court in Colorado, and so there were all kinds of things going on. Our role was relatively limited until Hale Friesen left out. I'm running short on time. If your honors have other questions, I want to hear them, but there are a couple of points that I would like to hit quickly. I think key to the legal issues are that what constitutes property for purposes of a bankrupt estate is different, entirely different legally, than what your disclosure obligations are. That's the Ninth Circuit's J.Z. case. We cite it at page 25, at page 31, and later. We understand that. All right. You're over time, but go ahead and wind up. I appreciate your patience. I'll sit down. Thank you for your questions. Thank you, counsel. Yes, sir. Honors, thank you. Answering your standing question, Justice, 11 U.S.C. 541-A-6 says that post-bankruptcy services belong to the debtor and are not part of the estate. The contract in 1994 required Mr. Dialli to provide post-bankruptcy services. He did provide those services. There's no dispute in the record about that. Those admitted facts establish that there is some level of compensation that he's entitled to post-bankruptcy and was entitled to, and he had standing to pursue it. So the claim that he has no standing to pursue any claim is just plain wrong under bankruptcy law, and the federal court, frankly, made a mistake on that. With regard to the property interest argument, I concede that the case law talks about the duty to disclose being broader than what ends up being property in the bankruptcy. The analysis doesn't go to this final point in any of the briefs, which is important and critical. In order for judicial estoppel to apply, there had to have been some advantage. That's a test. If you don't disclose something on a schedule which is not property of the estate, then there is no benefit to you and no detriment to the creditors. If you over-disclose and it turns out not to be property of the estate, again, no one's harmed. It's good that you've disclosed, but there's no difference. It really didn't matter whether you disclosed or didn't disclose. If this claim has any merit, the creditors would have gotten the 5.6 mil instead of Dialli. Not necessarily because some level of compensation under 541 for post-bankruptcy services would belong to Dialli. There might be some additional consideration beyond the penalties, which were not part of the earlier, that he could enforce, that they couldn't. What he got was no more than what the 94, extra, the 94 guarantee gave him. So if there's other... No, I don't think you can say that. You're saying what he got was no more than what the 94 gave him, but the 94 includes activities pre-petition. So to the extent that you're trying to tell us everything is post-petition, I just don't think that flies. There's some of the consideration just hasn't been allocated. We have no allocation. He had enough independent claims under the 94 guarantee to come back and validly say the 5.6 million should be all, quote, post-petition efforts on my behalf. If there are some uncompensated for claims that he didn't have standing to pursue that the bankruptcy trustee has for additional consideration, I've answered those questions. That's additional. But going back to the property interest, again, the reason the property interest is critical, and it's a red herring to say that you have to put on schedules, that that alone is dispositive of judicial estoppel, is that if what you didn't disclose turns out not to be a property interest, and you do have to get to that point of property interest, then there is no judicial estoppel because there was no undue benefit that the creditors didn't have. That's where the analysis of Holland and Knight falls down. They talk about those two but don't take you to the ultimate conclusion on that. And then I'd leave you with the following point in terms of the complaint. It is not a coincidence that the complaint filed in this case raised no claim for promissory estoppel or pre-bankruptcy in your own blue chip contract. Intelligent lawyers looked at the facts and framed the complaint very narrowly for a reason. And I pose that question to you. That's not just a happenstance that occurred. And the reason they did that, I would suggest to you, is that Holland and Knight and the other lawyers looked at it and said, you know, we can't go after any pre-bankruptcy claims because there might be judicial estoppel, but this 1994 guarantee specific, different facts, different terms, different work is not precluded because it's a different claim and it didn't exist at the time of the bankruptcy. And it is on different facts and it gives us a different legal basis in good faith and honestly for making that claim. Thank you, counsel. Thank you. Holland and Knight v. Attlee is submitted.
judges: Alarcon, Kleinfeld, Clifton